1         IN THE CIRCUIT COURT OF MILWAUKEE COUNTY

2            STATE OF WISCONSIN

3  ---------------------------------------------------------

4   SHEENAH ARENZ,

5            Plaintiffs,
     and
6

7   STATE OF WISCONSIN DEPARTMENT
OF HEALTH SERVICES and UNITED
HEALTHCARE,
8

9           Involuntary Plaintiffs,

10    vs.            Case No. 19-CV-2536

11   INMATE SERVICES CORPORATION
and MARIUS NESBY,

12          Defendants.
---------------------------------------------------------
13

14

15        Deposition of SHEENAH ARENZ

16        Thursday, January 9, 2020

17           1:19 p.m.

18      LAW OFFICES OF ROBERT A. LEVINE
        630 North Broadway
19        Milwaukee, Wisconsin

20

21

22

23

24

25      Reported by Christine A. Kovac, RPR

EXHIBIT
A

Page 2

```
1          Deposition of SHEENAH ARENZ, a witness
2   in the above-entitled action, was taken at the instance of
3   the Defendants, under and pursuant to the provisions of
4   Chapter 804 of the Wisconsin Statutes, and pursuant to
5   Notice, before me, CHRISTINE A. KOVAC, RPR, Registered
6   Professional Reporter, and Notary Public in and for the
7   State of Wisconsin, at LAW OFFICES OF ROBERT A. LEVINE,
8   630 North Broadway, Milwaukee, Wisconsin, on the 9th day
9   of January, 2020, commencing at 1:19 p.m. and concluding
10  at 3:23 p.m.
11
12
13
14
15              A P P E A R A N C E S
16          LAW OFFICES OF ROBERT A. LEVINE, by
            Mr. Robert A. Levine
17          630 North Broadway
            Milwaukee, Wisconsin 53202
18          Appeared on behalf of the Plaintiff.
19          CRIVELLO CARLSON, S.C., by
            Mr. Steven McGaver
20          710 North Plankinton Avenue, Suite 500
            Milwaukee, Wisconsin 53203
21          Appeared on behalf of the Defendants.
22
23
24
25
```

Page 3

```
1                    I N D E X
2   EXAMINATION BY:                          PAGE:
3   Mr. McGaver                                 4
4
5
6                 E X H I B I T S
7   NUMBER:    EXHIBIT DESCRIPTION:          PAGE:
8   Exhibit 1  Amended Summons and Amended Complaint   54
    Exhibit 2  Copies of text message communications   62
9   Exhibit 3  Medical Record from January 15, 2019    86
10
    (Original exhibit attached to original transcript; exhibit
11      copies provided to attorneys requesting copies.)
12
13
14
15
16
17
18                 R E Q U E S T S
19             (No requests were made.)
20
21
22
23
24
25
```

Page 4

```
1              TRANSCRIPT OF PROCEEDINGS
2          SHEENAH ARENZ, called as a witness herein,
3   by the Defendants, after having been first
4   duly sworn, was examined and testified as follows:
5              E X A M I N A T I O N
6   Q   Hi. Ms. Arenz, right?
7   A   Arenz.
8   Q   My name is Steve McGaver. We met briefly before the
9       deposition. I'm not going to go through the rules
10      again --
11  A   Okay.
12  Q   -- because I believe your lawyer just went through
13      them a little bit off the record. If you don't
14      understand a question that I'm asking, I will ask that
15      you tell me; and I'll try to rephrase the question or
16      I'll ask it in a way that, hopefully, will make you
17      understand it. Are you with me?
18  A   Yes, I am.
19  Q   If you need to take a break -- I don't know how long
20      we'll be going; hopefully not long enough where you'll
21      need to take a break -- I just ask that, if there's a
22      question pending, we don't take a break until the
23      question is answered. Fair enough?
24  A   Yes.
25          MR. LEVINE: Let's go off the record for a
```

Page 5

```
1   second.
2          MR. McGAVER: Yes.
3          (A brief discussion was held off the
4   record.)
5          MR. McGAVER: Back on the record.
6   Q   Could you please state your full name?
7   A   Sheenah Lynn Arenz.
8   Q   Have you ever gone by any other names?
9   A   Yes.
10  Q   What are those?
11  A   Sheenah Lynn Schloesser.
12  Q   Can you spell the last name?
13  A   Schloesser, S-c-h-l-o-e-s-s-e-r.
14  Q   Is that your maiden name?
15  A   Yes, it is.
16  Q   Arenz is your married name?
17  A   Yes, it is.
18  Q   Have you ever gone by any other names?
19  A   No.
20  Q   What's your current address?
21  A   209 South Warren Street in Watertown, Wisconsin,
22      53094.
23  Q   Have you ever taken a deposition before?
24  A   No.
25  Q   Lucky me.
```

**Page 6**

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What's the highest grade you completed in school? |
| 3 | A | Some college. |
| 4 | Q | How many years? |
| 5 | A | Two. |
| 6 | Q | Where did you go to college? |
| 7 | A | University of Phoenix, online. |
| 8 | Q | Online? |
| 9 | A | Yes. |
| 10 | Q | So you would have sophomore standing or junior |
| 11 | | standing, if you went back? |
| 12 | A | Sophomore. |
| 13 | Q | Did you graduate high school? |
| 14 | A | Yes, I did. |
| 15 | Q | Where from? |
| 16 | A | American School. |
| 17 | Q | Where is that? |
| 18 | A | Lancing, Illinois. |
| 19 | Q | What year? |
| 20 | A | 2002. |
| 21 | | MR. LEVINE: Let me cut you off for a |
| 22 | | second. |
| 23 | | Slow down a little bit because she's got to |
| 24 | | get you down. Just take your time. |
| 25 | | Go ahead. |

**Page 7**

| | | |
|---|---|---|
| 1 | | BY MR. McGAVER: |
| 2 | Q | 2002 you said? |
| 3 | A | Yes. |
| 4 | Q | What's your date of birth? |
| 5 | A | 5/28/83. |
| 6 | Q | Are you currently married? |
| 7 | A | Yes. |
| 8 | Q | And to who? |
| 9 | A | Kraig Arenz. |
| 10 | Q | I think I read somewhere that you were divorced. |
| 11 | A | Yes. |
| 12 | Q | Is that true? |
| 13 | A | Yes. |
| 14 | Q | And then you remarried Kraig Arenz; is that true? |
| 15 | A | Yes. |
| 16 | Q | When did you remarry Mr. Arenz? |
| 17 | A | August of 2019. |
| 18 | Q | When were you divorced? |
| 19 | A | March of 2015. |
| 20 | Q | Were you ever married to anyone else? |
| 21 | A | No. |
| 22 | Q | How many children? |
| 23 | A | One. |
| 24 | Q | Is he in the lobby right there? |
| 25 | A | Yes, he is. |

**Page 8**

| | | |
|---|---|---|
| 1 | Q | How old is he? |
| 2 | A | 16. |
| 3 | Q | Is there anything about today that would affect your |
| 4 | | ability to provide truthful and accurate testimony to |
| 5 | | the deposition today? |
| 6 | A | No. |
| 7 | Q | Any drugs that would affect your memory? |
| 8 | A | No. |
| 9 | Q | Any prescription medications? Anything like that? |
| 10 | A | No. |
| 11 | Q | Alcohol? |
| 12 | A | No. |
| 13 | Q | Any memory issues that we should know about? |
| 14 | A | No. |
| 15 | Q | I didn't think so, but I had to ask. |
| 16 | | Other than meeting with your lawyer, which I |
| 17 | | don't want to know anything about, did you do anything |
| 18 | | to prepare for the deposition today? |
| 19 | A | No. |
| 20 | Q | You didn't review any documents? |
| 21 | A | No. |
| 22 | Q | You didn't speak with anyone? |
| 23 | A | No. |
| 24 | Q | Are you currently employed? |
| 25 | A | No. |

**Page 9**

| | | |
|---|---|---|
| 1 | Q | When is the last time that you were employed? |
| 2 | A | December of 2019. |
| 3 | Q | And how were you employed in December of 2019? |
| 4 | A | Part-time. |
| 5 | Q | Where did you work? |
| 6 | A | Country Inn & Suites. |
| 7 | Q | Is that in Pewaukee? |
| 8 | A | Fort Atkinson. |
| 9 | Q | What did you do at the Country Inn & Suites in Fort |
| 10 | | Atkinson? |
| 11 | A | Housekeeping. |
| 12 | Q | How many hours a week? |
| 13 | A | It ranged from probably 10 to 20. |
| 14 | Q | Prior to that job, what was your previous employment? |
| 15 | A | Trilogy. |
| 16 | Q | What is Trilogy? |
| 17 | A | It's a golf course restaurant. |
| 18 | Q | Where? |
| 19 | A | Scottsdale, Arizona. |
| 20 | Q | What did you do at Trilogy? |
| 21 | A | Waitressed. |
| 22 | Q | Can you give me the dates of your employment roughly |
| 23 | | at Trilogy? |
| 24 | A | February 2019 -- 2018 -- I'm sorry -- to April 2018. |
| 25 | Q | So just a couple of months then, right? |

1  A  Yes.
2  Q  What about prior to serving as a waitress at Trilogy,
3      what did you do employment-wise?
4  A  I worked at Fox City Sign.
5  Q  Where is Fox City Sign?
6  A  Menasha, Wisconsin.
7  Q  What did you do for Fox City Sign?
8  A  Office manager.
9  Q  What are your dates of employment there?
10  A  May 2017 to December 2017.
11  Q  I bet you could have predicted it was coming.  What
12      about prior to Fox City Sign?
13  A  I owned my own business.
14  Q  What kind of business?
15  A  I owned a hotel.
16  Q  Where was the hotel located?
17  A  Door County.
18  Q  How many rooms?
19  A  Twelve.
20  Q  Did you own it by yourself or with your husband?
21      Someone else?
22  A  I had a land contract with an investor.
23  Q  Land contract with -- I missed who it was.
24  A  An investor.
25  Q  An investor.  And other than owning the hotel, did you

1      also work there?
2  A  Yes, I did.
3  Q  What did you do?
4  A  Everything.  I did the reservations, housekeeping,
5      maintenance; anything that needed to be done.
6  Q  What was the name of the hotel?
7  A  The Harbor Light Inn.
8  Q  Located where?
9  A  In Ellison Bay.
10  Q  Is it still in existence today?
11  A  Yes, it is.
12  Q  Do you still own a portion of it?
13  A  No.
14  Q  Is it still called The Harbor Light Inn?
15  A  Yes.
16  Q  Any military experience?
17  A  No.
18  Q  Have you ever been a party to a civil lawsuit before?
19  A  No.
20  Q  Never as a plaintiff or a defendant?
21  A  No.
22  Q  Have you ever been convicted of a crime?
23  A  Yes.
24  Q  How many times?
25  A  I believe six.

1  Q  On six separate occasions or six separate crimes?
2  A  Six separate occasions.
3  Q  Can you run through what those crimes were and roughly
4      when you were convicted of them?
5          MR. LEVINE:  I'm going to object.  I don't
6      think you're entitled to that information.
7          MR. McGAVER:  It should be a matter of
8      public record.
9          MR. LEVINE:  Well, it would be.
10      Let's go off the record.
11          (A brief discussion was held off the
12      record.)
13          MR. McGAVER:  Back on the record.
14  Q  Your attorney has instructed you not to answer the
15      question.  Are you going to follow your lawyer's
16      advice?
17  A  Yes.
18  Q  Okay.  Well, let's talk a minute about Winnebago
19      County Case 18-CF-179.  You were charged with theft in
20      a business setting in between $5,000 and $10,000 in
21      March of 2018.  Is that right?
22          MR. LEVINE:  That one you can answer because
23      that has to do with why you were picked up in
24      Scottsdale, so go ahead.
25          THE WITNESS:  Yes.

1  BY MR. McGAVER:
2  Q  And a warrant in Wisconsin was issued for your arrest,
3      again, in March of 2018.  Is that right?
4  A  Yes.
5  Q  And you were ultimately arrested in -- I believe it
6      was in Maricopa County, Arizona; is that right?
7  A  Yes.
8  Q  That's around the Scottsdale area?
9  A  Yes.
10  Q  Did you know about the existence of the warrant and
11      the fact that charges were brought against you, prior
12      to your arrest?
13  A  No.
14  Q  So when you were arrested, it was a surprise to you?
15  A  Yes.
16  Q  Who was the arresting agency, if you remember?
17  A  Scottsdale Police Department.
18  Q  The City of Scottsdale --
19  A  Yes.
20  Q  -- Police Department?
21      You just have to be careful.  Wait till I finish
22      before you answer.
23  A  Sorry.
24  Q  And when you were arrested, where did the Scottsdale
25      Police Department take you?

**Page 14**

1   A   Scottsdale Police Department.

2   Q   You went back to the local police department?

3   A   Correct.

4   Q   Were you -- how long did you stay at the local police

5      department?

6   A   A couple of hours.

7   Q   And then where were you taken?

8   A   To Maricopa County Jail.

9   Q   Who took you to the Maricopa County Jail?  What

10     agency?

11   A   The Maricopa Sheriff's Department.

12   Q   Do you happen to remember who from the sheriff's

13     department picked you up and took you to the Maricopa

14     County Jail?

15   A   No.

16   Q   Man?  Woman?

17   A   I do not recall.

18   Q   And you were booked into the Maricopa County Jail at

19     that time; is that right?

20   A   Yes.

21   Q   Were you fingerprinted and photographed?

22   A   Yes.

23   Q   Was that done at the Scottsdale Police Department or

24     Maricopa County Jail?

25          MR. LEVINE:  Or both?

**Page 15**

1          THE WITNESS:  Both.

2   BY MR. McGAVER:

3   Q   Both?

4   A   Both.

5   Q   And when you were at the Maricopa County Jail, you

6      were issued Maricopa County Jail clothing; is that

7      right?

8   A   Yes.

9   Q   They took your personal effects that you had with you

10     and stored them away from you; is that fair?

11   A   Yes.

12   Q   Did you have a cell phone on you?

13   A   In my property.

14   Q   What about other electronics, like an iPad?

15   A   No.

16   Q   Laptop computer?

17   A   No.

18   Q   How long were you kept in custody at the Maricopa

19     County Jail before you were brought before either a

20     judge, a magistrate or a court commissioner, in

21     Arizona?

22   A   I believe it was two days.

23   Q   Two days meaning two overnights at the Maricopa County

24     Jail?

25   A   Yes.

**Page 16**

1   Q   So it would have been the third day you appeared

2      before a judge or a court commissioner or a

3      magistrate, in Arizona; is that right?

4   A   Yes.

5   Q   Do you remember what judicial official you appeared

6      before?

7   A   Just the court commissioner.

8   Q   Do you remember the name?

9   A   No, I do not.

10   Q   What did they tell you when the court commissioner --

11     what did the court commissioner tell you when you made

12     that court appearance?

13   A   It was my extradition hearing.  I could fight it or I

14     could agree to it, and they would have 28 days to come

15     and get me.

16   Q   Did you have a lawyer represent you at that hearing?

17   A   No.

18   Q   Did the State of Arizona or Maricopa County make a

19     public defender available to you?

20   A   No.

21   Q   Did you speak with private counsel prior to that

22     extradition hearing?

23   A   No.

24   Q   Did the court commissioner tell you where you were

25     being extradited to?

**Page 17**

1   A   Yes.

2   Q   And they told you it was Wisconsin?

3   A   Yes.

4   Q   What about the arresting officers, did they tell you

5      why they were arresting you?

6   A   Yes.

7   Q   And what did they tell you?

8   A   That it was theft from my previous employer.

9   Q   Which employer was that?

10   A   Fox City Sign.

11   Q   Did they tell you how much that Fox City Sign said

12     that you stole?

13   A   $10,000.

14   Q   Did they give you any more details?

15   A   No.

16   Q   Meaning, the arresting law enforcement officers?

17   A   No.  They did not have the criminal complaint.

18   Q   What about the court, did the court or the prosecutor

19     in the courtroom have any more details that they

20     shared with you about the warrant or the Wisconsin

21     case, at that time?

22   A   No.  It was just for extradition.

23   Q   Did you go through the extradition process or did you

24     waive it?

25   A   I waived -- if I'm answering it correctly, I waived

**Page 18**

```
1       it, so that way, the 28 days would start.
2   Q   So you waived extradition and started the clock, so to
3       speak, on the 28-day period for the State of Wisconsin
4       to come pick you up and take you to Wisconsin.  Am I
5       stating that correctly?
6   A   Yes.
7               MR. LEVINE:  Sort of.  The State of
8       Wisconsin doesn't pick anyone up.
9               MR. McGAVER:  Well, that's true, but they
10      order people, or ask people, to pick them up.
11              MR. LEVINE:  That's correct.  Go ahead.
12  BY MR. McGAVER:
13  Q   Did anyone, either in the court proceedings or in your
14      conversations with law enforcement officials, explain
15      to you how you would ultimately be transported to
16      Wisconsin, while you were still housed in the Maricopa
17      County Jail?
18  A   No.
19  Q   Did anyone tell you anything about the arrangements
20      that were being made about your transportation to the
21      State of Wisconsin, while you were housed in the
22      Maricopa County Jail?
23  A   No.
24  Q   After the extradition hearing, how much time did you
25      -- how much additional time did you spend in the
```

**Page 19**

```
1       Maricopa County jail?
2   A   27 days.
3   Q   So two days prior to your -- strike that.
4               How many court appearances did you attend in the
5       state of Arizona?
6   A   One.
7   Q   So two days prior to your court appearance -- or two
8       nights I think we established prior to your court
9       appearance.  You had your court appearance, and then
10      you spent an additional 27 days in the Maricopa County
11      Jail in Arizona; is that right?
12  A   Yes.
13  Q   Can you walk me through how it is you came to leave
14      the Maricopa County Jail?
15  A   They said my transport was there.
16  Q   Who's "they"?
17  A   The deputy in our dorm at the jail.  And they took me
18      down to a different jail to wait for my transport.
19  Q   Did the deputy in the dorm -- I'm sorry to interrupt
20      you.  Did the deputy in the dorm give you any more
21      information about your transport at that time?
22  A   No.  She just said, "Pack up.  Your ride is here."
23  Q   And you were taken, you said, to a different jail?
24  A   Yes.
25  Q   Or a different section of the jail?
```

**Page 20**

```
1   A   No.  It's a different jail.  We had to get in a
2       vehicle to be taken to another jail.
3   Q   Oh, I see.  And what kind of a vehicle were you
4       transported in to get from one jail to another jail?
5       In other words, what law enforcement agency's vehicle
6       was it?
7   A   Sheriff's department.  And it was a -- it resembled an
8       ambulance.
9   Q   And it was a Maricopa County sheriff's vehicle?
10  A   Yes.
11  Q   And they took you to a different jail?
12  A   Yes.
13  Q   How long -- were you the only passenger?
14  A   Yes.
15  Q   How long was the ride?
16  A   10 minutes.
17  Q   And when you arrived at the second jail, tell me what
18      happened next.
19  A   They put me in a holding cell and waited for my
20      transport to arrive.
21  Q   How long were you in the holding cell?
22  A   Three hours.
23  Q   Were you alone?
24  A   No.
25  Q   How many other people in the holding cell?
```

**Page 21**

```
1   A   Ten.
2   Q   Did you speak to any of those ten people in the
3       holding cell?
4   A   No.
5   Q   Did any of them speak to you?
6   A   No.
7   Q   What time of day did this take place?
8               MR. LEVINE:  That she was in the holding
9       cell or when she was picked up?  What's your question?
10              MR. McGAVER:  When she was in the holding
11      cell.
12              MR. LEVINE:  Okay.
13              MR. McGAVER:  You're right, because three
14      hours had transpired, so fair point.
15              THE WITNESS:  7:00 in the morning.
16  BY MR. McGAVER:
17  Q   And then, based on your testimony, if I'm
18      understanding you correctly, at about 10:00 in the
19      morning, your transport arrived; is that right?
20  A   Yes, it was roughly around then.
21  Q   What happened to your jail-issued clothing when your
22      transport arrived?
23  A   They put me in my street clothes that I came in with.
24  Q   That's the deputy in the Maricopa County Sheriff's
25      Department?
```

**Page 22**

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And what about your personal effects, what was done |
| 3 | | with your cell phone and your purse or keys or |
| 4 | | whatever else you had? |
| 5 | A | They were given to the transport driver, Marius. |
| 6 | Q | That's Marius Nesby? |
| 7 | A | Yes. |
| 8 | Q | Was Mr. Nesby alone in the transport vehicle or did he |
| 9 | | have a partner? |
| 10 | | MR. LEVINE: When? |
| 11 | | BY MR. McGAVER: |
| 12 | Q | When you first encountered him. |
| 13 | A | He had a partner. |
| 14 | Q | Tell me how you first encountered Mr. Nesby. We left |
| 15 | | off where you had just, essentially, changed your |
| 16 | | clothes. You were in your street clothes. Tell me |
| 17 | | what happens next. |
| 18 | A | They take me out of the holding cell, and then Marius |
| 19 | | handcuffed me in the jail. |
| 20 | Q | Mr. Nesby walked into the jail, met you outside of |
| 21 | | your holding cell and handcuffed you? |
| 22 | A | He met me at the counter for booking and obtained a |
| 23 | | plastic bag that had any personal belongings in it, |
| 24 | | and my file folder. |
| 25 | Q | Was he alone? |

**Page 23**

| | | |
|---|---|---|
| 1 | A | Yes, he was. |
| 2 | Q | Where did he take you? |
| 3 | A | He took me to the van. |
| 4 | Q | Can you describe the van for me? |
| 5 | A | It was a white van. |
| 6 | Q | Full-size van? |
| 7 | A | Yes. Newer. |
| 8 | Q | Any markings on it? |
| 9 | A | No. |
| 10 | Q | Any caging on it? |
| 11 | A | No. |
| 12 | Q | Do you understand what I mean by "caging"? |
| 13 | A | Yes, I do. |
| 14 | Q | Like a paddy wagon. |
| 15 | A | No. It was all open. |
| 16 | Q | Any windows in the back of the van? |
| 17 | A | Yes. It resembled a Mercedes van. |
| 18 | Q | Can you describe Mr. Nesby's physical appearance for |
| 19 | | me? |
| 20 | A | He was African American. He appeared to be older, |
| 21 | | maybe mid to late 50s, heavier set, and about |
| 22 | | five-seven, five-eight. |
| 23 | Q | Any tattoos or scars that you noticed? |
| 24 | A | I do not recall. |
| 25 | Q | What about facial hair? |

**Page 24**

| | | |
|---|---|---|
| 1 | A | At first, no. Throughout the first seven days, it |
| 2 | | started to grow in. |
| 3 | Q | I'm not going to ask to do it here today, but do you |
| 4 | | think you could pick him up out of a lineup? |
| 5 | A | Yes. |
| 6 | Q | Any other unique characteristics that you noticed |
| 7 | | about Marius Nesby? |
| 8 | A | Not that I recall. |
| 9 | Q | Was he wearing a uniform of any type when he picked |
| 10 | | you up? |
| 11 | A | Black pants and a darker gray shirt. |
| 12 | Q | Did he have a badge? |
| 13 | A | He had something hanging around his neck that |
| 14 | | resembled, like, a badge case. |
| 15 | Q | Was it clear plastic? Could you see through it? |
| 16 | A | No. It was black. |
| 17 | Q | When you first encountered Mr. Nesby, did he identify |
| 18 | | himself? |
| 19 | A | He just said that he was the transporter. |
| 20 | Q | He didn't give you his name? |
| 21 | A | No. |
| 22 | Q | Did he tell you what company he worked for? |
| 23 | A | No. |
| 24 | Q | Did he show you any identification? |
| 25 | A | No. |

**Page 25**

| | | |
|---|---|---|
| 1 | Q | Did you see him show any identification to any staff |
| 2 | | member of the Maricopa County Jail? |
| 3 | A | Just when he had to fill out his paperwork. |
| 4 | Q | Did you see him fill out his paperwork? |
| 5 | A | Yes. |
| 6 | Q | Did you see anything that he wrote on his paperwork? |
| 7 | A | No. |
| 8 | Q | Was he wearing glasses? |
| 9 | A | I do not recall. |
| 10 | Q | Was he in possession of any, what I'll call, police |
| 11 | | equipment? Do you know what I mean by that? |
| 12 | A | No. |
| 13 | Q | Did he have handcuffs with him? |
| 14 | A | Yes. |
| 15 | Q | What about pepper spray? |
| 16 | A | I do not recall. |
| 17 | Q | Did he have a police baton or a billy club? |
| 18 | A | In the van, yes. |
| 19 | Q | But not when he brought -- nothing resembling a baton |
| 20 | | or a billy club that he brought with him to the jail, |
| 21 | | right? |
| 22 | A | No. |
| 23 | Q | Did he have a gun on him? |
| 24 | A | Yes, in the van. |
| 25 | Q | Do you remember what kind of a gun it was? |

Page 26

| | | |
|---|---|---|
| 1 | A | It was -- I'm not familiar with guns, but it was just |
| 2 | | a small black one. |
| 3 | Q | Was it a handgun? |
| 4 | A | Yes. |
| 5 | Q | Was it a revolver? |
| 6 | | MR. LEVINE: She's testified she's not |
| 7 | | familiar with guns. |
| 8 | | I don't know. Can you answer that? |
| 9 | | THE WITNESS: It was just -- |
| 10 | | MR. McGAVER: Let me ask it a different way. |
| 11 | Q | Can you describe the gun for me? |
| 12 | A | Yes. It was black and it was flat. And then it just |
| 13 | | had -- like he pulled -- you would pull the top back |
| 14 | | and then release the trigger. |
| 15 | Q | Okay. Where did he store the gun in the van? |
| 16 | A | In the driver's side or passenger's side door, |
| 17 | | depending upon which side he was sitting on. |
| 18 | Q | Did any other employees from the transport company |
| 19 | | ever come into the jail to get you besides Mr. Nesby? |
| 20 | A | No. |
| 21 | Q | Mr. Nesby handcuffed you in the jail? |
| 22 | A | Yes. |
| 23 | Q | And he walked you out to the van? |
| 24 | A | Yes. |
| 25 | Q | What did he instruct you to do? |

Page 27

| | | |
|---|---|---|
| 1 | A | Nothing. He just opened the door, and I got in. |
| 2 | Q | Do you remember where you sat in the van when you were |
| 3 | | first picked up? |
| 4 | A | Yes, right behind the driver. |
| 5 | Q | There was a driver who is separate from Mr. Nesby? |
| 6 | A | No. That would have been -- he was driving. |
| 7 | Q | Was there any other employee of the transport company |
| 8 | | in the van? |
| 9 | A | Yes. |
| 10 | Q | And can you describe that person? |
| 11 | A | It was a female, African American. She was about |
| 12 | | five-eight, five-nine. She wore black pants, gray |
| 13 | | shirt. She had the same black badge hanging around |
| 14 | | her neck, and she always wore a baseball cap. |
| 15 | Q | Did you ever come to know her name? |
| 16 | A | Yes, but I do not recall it at this point. |
| 17 | Q | Did she carry handcuffs with her? |
| 18 | A | Not on her. |
| 19 | Q | And she was wearing a similar type of uniform that |
| 20 | | Mr. Nesby was wearing? |
| 21 | A | Yes. |
| 22 | Q | Were there they other persons in the van besides this |
| 23 | | woman, Mr. Nesby, and you, when you first got picked |
| 24 | | up? |
| 25 | A | Yes. |

Page 28

| | | |
|---|---|---|
| 1 | Q | How many other people? |
| 2 | A | Three other male inmates. |
| 3 | Q | Where were they seated? |
| 4 | A | Two were in the bucket seat behind me and one was on |
| 5 | | the bench seat behind the bucket seats. |
| 6 | Q | Did you ever come to learn the names of those |
| 7 | | individuals? |
| 8 | A | Yes. |
| 9 | Q | Do you remember them now? |
| 10 | A | No, I do not recall their names. |
| 11 | Q | Do you know whether those individuals were picked up |
| 12 | | from Maricopa County Jail? |
| 13 | A | No, they were not. |
| 14 | Q | They were picked up from -- do you know where they |
| 15 | | were picked up from? |
| 16 | A | Some had said that they came from Texas, and one came |
| 17 | | from Mississippi. And I do not recall where the other |
| 18 | | one came from. |
| 19 | Q | When you were seated in the van, were you still |
| 20 | | handcuffed? |
| 21 | A | Yes. |
| 22 | Q | Were the other three male inmates handcuffed, as well? |
| 23 | A | Yes. |
| 24 | Q | Were you chained to the floor of the van? |
| 25 | A | No. We had shackles around our ankles and then just |

Page 29

| | | |
|---|---|---|
| 1 | | separate cuffs in front of us for our wrists. |
| 2 | Q | Do you know what a stun belt is? |
| 3 | A | No. |
| 4 | Q | It's fair to say you weren't fitted with a stun belt |
| 5 | | while you were in the van, right? |
| 6 | A | Correct. |
| 7 | Q | Were you given any food or water when you initially |
| 8 | | made your way into the van? |
| 9 | A | No. |
| 10 | Q | Did you have access to a phone in the van? |
| 11 | A | No. |
| 12 | Q | Other than the one gun that we talked about |
| 13 | | previously, did you see any other guns in the van? |
| 14 | A | No. He told us that was the only one he had. |
| 15 | Q | Did you ride in the same vehicle for the entirety of |
| 16 | | the trip to Wisconsin? |
| 17 | A | No. |
| 18 | Q | Do you know what day you left Maricopa County? |
| 19 | A | I do not know the date. |
| 20 | Q | Do you know what day of the week it was? |
| 21 | A | No, I do not. |
| 22 | Q | Do you know what time it was? |
| 23 | A | Morning. |
| 24 | | MR. LEVINE: She's indicated -- she said |
| 25 | | 10:00, about. |

**Page 30**

1  BY MR. McGAVER:
2  Q  10:00 in the morning is when you left?
3        MR. LEVINE: She was picked up.
4  BY MR. McGAVER:
5  Q  Did Mr. Nesby, his female partner, or anyone from the
6     Maricopa County Jail tell you anything about the route
7     that they were planning on taking to get you to
8     Winnebago County, Wisconsin?
9  A  No.
10 Q  Anyone tell you how long they thought the trip would
11    take?
12 A  No. It was explained that when they get an offer for
13    somebody that is close to our route, and if we have
14    room, we could pick them up, or drop off the ones we
15    had.
16 Q  Do you know where the other three prisoners were
17    supposed to be taken?
18 A  We dropped one off in Los Angeles and one off in -- I
19    believe it was Wyoming. And I do not recall where the
20    third one was dropped off at.
21 Q  All prior to you being dropped off in Wisconsin, I
22    presume. Right?
23 A  Yes.
24 Q  All right. That would make sense.
25       How long were you on the road before your first

**Page 31**

1     stop to either to use the restroom, to get gas -- any
2     kind of a stop?
3  A  We stopped for dinner around 5:00 p.m.
4  Q  So from 10:00 in the morning, when you left, until
5     5:00 approximately, you were on the road the entire
6     day without stopping?
7  A  Yes.
8  Q  Not for gas? Not for anything?
9  A  Correct. He was behind schedule with picking up
10    another person.
11 Q  Do you remember where geographically you stopped for
12    dinner?
13 A  I do not recall. Southern Cal -- Southern California.
14    All I remember is it was past Barstow, California.
15 Q  Do you remember what restaurant you stopped at?
16 A  I do not recall.
17 Q  And you ate dinner at this restaurant?
18 A  He would go in and order everybody's food -- it was
19    always the same -- and then bring it out.
20 Q  "He", meaning Marius Nesby would do this?
21 A  Yes.
22 Q  Did you get to order your own food or was it the same
23    order for everyone?
24 A  No. It was the same order for everyone.
25 Q  What was that order?

**Page 32**

1  A  It varied on the place that we went to.
2  Q  Do you remember what it was at this first place?
3  A  No, I don't recall.
4  Q  Did you ever exit the van while you were stopped at
5     that restaurant?
6  A  Yes.
7  Q  And was it to use the bathroom?
8  A  And to stretch.
9  Q  How long were you allowed outside of the van?
10 A  Until everyone was ready to go. We didn't have a time
11    frame.
12 Q  More or less than a half hour?
13 A  Approximately a half hour.
14 Q  Okay. Did you eat while you were stopped or in the
15    van on the road?
16 A  Sometimes both.
17 Q  Okay. What about this first stop?
18 A  It was outside of the van.
19 Q  But you still stopped in the parking lot of the
20    restaurant, I presume?
21 A  Yes.
22 Q  You departed -- we're at about 5:30, if I'm following
23    your timeline correctly; is that right?
24 A  Yes.
25 Q  How much longer did you drive until your next stop?

**Page 33**

1  A  I don't recall.
2  Q  Do you know where your next stop would have been
3     geographically?
4  A  Around the Los Angeles area.
5  Q  Do you know where?
6  A  We made a stop at the Twin Towers in Los Angeles.
7  Q  What was the reason for that stop at the Twin Towers?
8  A  We had to drop somebody off there.
9  Q  And this is the same date that you were picked up; is
10    that right?
11 A  Yes.
12 Q  Okay. How long was that stop at the Twin Towers?
13 A  Roughly, half hour.
14 Q  Okay. Were you allowed out of the van there?
15 A  Yes. We all got out and went inside.
16 Q  How many days was the trip in total from Maricopa
17    County, Arizona to Wisconsin, for you?
18 A  I believe it was roughly two weeks.
19 Q  Did you stop for the night on the night of the first
20    -- or the day -- strike that.
21       Did you stop on the night of the day you were
22    picked up?
23 A  They kept driving.
24 Q  All through the night?
25 A  We stopped on the eighth day.

**Page 34**

```
 1   Q   And I presume that Marius Nesby and his partner
 2       switched driving responsibilities; is that right?
 3   A   Yes.
 4   Q   And they kept driving until the eighth day?
 5   A   Yes.
 6   Q   Do you remember where you stopped on the eighth day?
 7   A   Utah.
 8   Q   Was that at a hotel or someplace else?
 9   A   We went to a jail in Salt Lake City for the night.
10   Q   From day one, when you were in the van, until the
11       eighth day, approximately how many times were
12       prisoners dropped off?
13   A   I don't recall.
14   Q   How many times were they picked up?  Do you remember
15       that?
16   A   I believe three.
17   Q   Were there any of the initial three prisoners still
18       with you on the night that you stopped in Utah?
19   A   Yes, one.
20   Q   And do you remember where that gentleman's final
21       destination was supposed to be?
22   A   I do not recall.
23   Q   You stopped in jail in Salt Lake City.  You were taken
24       into the jail, and stayed the night in a holding cell;
25       is that right?
```

**Page 35**

```
 1   A   No.  They put us in general population.
 2   Q   What time of the day did you arrive at this jail?
 3   A   It was evening.
 4   Q   Did they issue you jail clothing when you arrived?
 5   A   Yes.
 6   Q   Do you know whether your personal effects remained in
 7       the van, or were they brought in with you to the jail?
 8   A   They stayed in the van.
 9   Q   Do you remember the names of any of the prisoners that
10       rode with you during the entirety of your two-week
11       trip?
12   A   Yes, a couple of them.
13   Q   What are the names that you remember?
14   A   Geri Ann.
15   Q   Anyone else?
16   A   The other two were only their nicknames.  It was Tayee
17       (ph) and Chicago.
18   Q   Any other female prisoners?
19   A   Just Geri Ann.
20   Q   Geri Ann?  And can you spell that?
21   A   I have -- I don't know how to do that.
22           MR. LEVINE:  Probably just Geri Ann.
23           MR. McGAVER:  It was a stretch.
24           MR. LEVINE:  You didn't get her autograph?
25           THE WITNESS:  I do have her information.
```

**Page 36**

```
 1   BY MR. McGAVER:
 2   Q   In the first eight days, prior to the Utah stop, were
 3       you ever alone with Marius Nesby?
 4   A   Prior to the eighth day?
 5   Q   Within the first eight days.
 6           MR. LEVINE:  Read that question back.
 7           MR. McGAVER:  Let me -- strike it.  I'll
 8       rephrase it.
 9   Q   From the point in time that you were picked up from
10       Maricopa County Jail, until the point in time where
11       you spent the night in the Salt Lake City Area Jail in
12       Utah, were you ever alone with Marius Nesby?
13   A   Yes.
14   Q   How many times?
15   A   I recall four times.
16   Q   A few enough number where we should probably take them
17       one by one.  Can you describe the first time that you
18       were alone with Marius Nesby within the time period
19       that we just spelled out?
20   A   I don't recall the locations, but every time that I
21       was alone was at a gas station or a rest area.
22   Q   And you would be alone in the van with Mr. Nesby?
23   A   No.  Once -- I was alone in the van with him twice,
24       but it was after the eight days.  And then, prior to
25       it, it was, he would take me and a guy to go use the
```

**Page 37**

```
 1       restroom at a time, and then when the guy went in, he
 2       would make me wait with him.
 3   Q   I see.  Ever alone with Mr. Nesby's partner within the
 4       first eight-day period?
 5   A   No.
 6   Q   Your allegations in the case are in regards to a
 7       sexual assault that was perpetrated by Mr. Nesby, and
 8       I'll tell you, I take no pleasure in asking these
 9       questions, but I do need the information about the
10       assaults.  So I'm going to ask that you bear with me
11       during the questions.
12           You're alleging that at the time of the assault
13       -- well, let me ask it a different way.
14           Are you alleging that at the time of the
15       assault, or the assaults perpetrated by Mr. Nesby,
16       that other Inmate Services employees participated in
17       the assaults?
18   A   No.
19   Q   Are you alleging that other Inmate Services employees
20       knew about the assaults as they were happening?
21   A   Yes, one.
22   Q   Who do you say knew about the assault at the time it
23       was happening?
24   A   The second transport driver when we switched vehicles.
25   Q   How far into the trip did you switch vehicles?  How
```

Page 38

| | | |
|---|---|---|
| 1 | | many days? |
| 2 | A | I do not recall. |
| 3 | Q | Was it before or after Utah? |
| 4 | A | After. |
| 5 | Q | Let's go back to the trip.  After Utah, how long were |
| 6 | | you driving in the transport van until you switched |
| 7 | | vehicles? |
| 8 | A | I do not recall how many days it was. |
| 9 | Q | After the initial overnight stop in Salt Lake City, |
| 10 | | how many days until you had another overnight stop? |
| 11 | A | We did not have another overnight. |
| 12 | Q | How many days into the trip was the first time that |
| 13 | | Mr. Nesby assaulted you? |
| 14 | A | Four days. |
| 15 | Q | Prior to Utah? |
| 16 | A | Yes. |
| 17 | Q | What did he do? |
| 18 | A | It was in the van, and he had reached behind the |
| 19 | | driver's seat and started rubbing up my leg. |
| 20 | Q | Right leg or left leg? |
| 21 | A | Left leg. |
| 22 | Q | With his right hand or his left hand? |
| 23 | A | It was his right hand. |
| 24 | Q | Was he saying anything at this time? |
| 25 | A | He was commenting on my hair. |

Page 39

| | | |
|---|---|---|
| 1 | Q | What did he say about your hair? |
| 2 | A | I had just taken it out of braids, and he said that it |
| 3 | | was very beautiful and he really liked women with my |
| 4 | | color hair and curly like that. |
| 5 | Q | Did you say anything in response? |
| 6 | A | No. |
| 7 | Q | When he was rubbing your leg, did you say anything to |
| 8 | | him? |
| 9 | A | No.  I just moved. |
| 10 | Q | Moved away from him, I presume? |
| 11 | A | Yes. |
| 12 | Q | Did he say anything to you when you moved away? |
| 13 | A | No.  He pulled his hand back. |
| 14 | Q | Is that how the encounter -- the assault ended? |
| 15 | A | Yes. |
| 16 | Q | Let's talk about the -- is there anything more that |
| 17 | | I'm missing in terms of the details of that assault |
| 18 | | that you believe are important or relevant? |
| 19 | A | No. |
| 20 | Q | Let's talk about the next time that Mr. Nesby |
| 21 | | assaulted you.  Can you describe what happened? |
| 22 | A | We were at a gas station that had a restaurant |
| 23 | | connected to it. |
| 24 | Q | I'll stop you just for a second.  How far into the |
| 25 | | trip are you during -- when the second assault |

Page 40

| | | |
|---|---|---|
| 1 | | happened? |
| 2 | A | Next day I would say. |
| 3 | Q | Okay. |
| 4 | A | So we -- he had walked me up to -- into the gas |
| 5 | | station. |
| 6 | Q | Alone? |
| 7 | A | Yes.  And it wasn't a single bathroom, so he made me |
| 8 | | stand outside the door before going in, and he starts |
| 9 | | rubbing his hand down my hair, down my back, and then |
| 10 | | it would have been my right butt cheek, at that time. |
| 11 | Q | Over your clothing? |
| 12 | A | Yes.  Saying that -- he'd say, "The things that I |
| 13 | | would like to do to you."  He said that he really |
| 14 | | likes me. |
| 15 | | And then I said, "I have to go to the bathroom. |
| 16 | | Can I go?" |
| 17 | Q | What did he say in response to that? |
| 18 | A | He said, "Yes.  We'll finish this conversation later." |
| 19 | Q | Was anything else said prior to you using the |
| 20 | | restroom? |
| 21 | A | No.  Well, yes.  Because he took my handcuffs off and |
| 22 | | said, "I'm not supposed to do this but I will for |
| 23 | | you." |
| 24 | Q | Did anyone witness that conversation, that you know |
| 25 | | of? |

Page 41

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | When you returned from the bathroom, did Mr. Nesby say |
| 3 | | anything more about your hair or your appearance? |
| 4 | | MR. LEVINE:  On that day? |
| 5 | | BY MR. McGAVER: |
| 6 | Q | At that time.  On that day. |
| 7 | A | Yes.  He put my cuffs back on when I came out.  He |
| 8 | | said, "I really do like you.  Do you feel the same?" |
| 9 | Q | What did you say? |
| 10 | A | I just turned and walked towards the vehicle. |
| 11 | Q | Do you remember how many prisoners were being |
| 12 | | transported at that time? |
| 13 | A | Four, five, six -- with me, seven. |
| 14 | Q | Is this a 15-passenger van?  Do you remember? |
| 15 | A | No.  It had -- well -- so there was the two -- the |
| 16 | | driver and the passenger seat, and then there was a |
| 17 | | bench seat where I sat, that could hold three.  And |
| 18 | | then there was two bucket seats.  And then there was |
| 19 | | just the bench seat behind them that could hold three. |
| 20 | Q | Do you remember the manufacturer of the first vehicle |
| 21 | | you rode in?  You said it looked like a Mercedes? |
| 22 | A | Right.  It could have been a Nissan, but it was very |
| 23 | | similar to what they look like. |
| 24 | Q | Tall, in other words? |
| 25 | A | Yes. |

Page 42

1 Q Did you ever sit anywhere other than immediately
2    behind the driver?
3 A No.
4 Q That was always your spot during the two-week trip?
5 A Yes. The women had to sit in that row.
6 Q And who explained that the woman had to sit in that
7    row, to you?
8 A Marius.
9 Q How many days into the trip did he explain that to
10    you?
11 A The first day.
12 Q The next time that Mr. Nesby assaulted you, can you
13    tell me what happened?
14 A It was at a rest area at night, and everyone was
15    getting out of the vehicle to go into the restroom --
16    he'd always have me get off last -- and then he
17    grabbed my arm when I was getting ready to walk,
18    and --
19 Q Let me ask you a couple of questions to clarify. Do
20    you know why Mr. Nesby had you get off last?
21 A No.
22 Q Did he ever tell you?
23 A No.
24 Q This was at a rest area as opposed to a gas station?
25 A Yes.

Page 43

1 Q No restaurants or -- or they didn't sell foods there,
2    other than maybe vending machines; is that right?
3 A Correct.
4 Q Okay. You said that he grabbed your arm as you were
5    exiting the van?
6 A Yes.
7 Q What happened next?
8 A So he said to me that -- well, I had my hair put up at
9    that time. He said he really liked my hair down, and
10    he rubbed my -- I was looking at him, so it would have
11    been my right arm. And he said, "Did you notice that
12    I kept your cuffs loose so you can take them off in
13    the van if you want to?"
14      And I said, "Yes, I did. Thank you."
15      And then he said, "If we stop somewhere and you
16    don't like what we're ordering, just whisper to me
17    what you'd like, and I'll order that for you."
18      So I said, "Okay." And then I went into the
19    bathroom.
20 Q So the only touching that occurred on this third
21    occasion was the rubbing of your right arm?
22 A Yes.
23 Q And he was whispering these things to you?
24 A Yes.
25 Q Okay. Did the conversation continue when you came out

Page 44

1    of the bathroom?
2 A No, because I was getting uncomfortable at that point.
3    So Geri Ann -- I explained to her what has been going
4    on, and I asked her not to leave my side.
5 Q How far into the trip did this third encounter with
6    Mr. Nesby take place? How many days?
7 A Around that time frame, I started losing track of the
8    days that we were in, but it couldn't have been more
9    than a couple of days.
10 Q Was it before or after Utah?
11 A That one was before. That was the last one before.
12 Q So all three of the incidents that we talked about
13    were prior to the stop?
14 A Yes.
15 Q This conversation that you had with Geri Ann, how long
16    after the third encounter with Mr. Nesby did you speak
17    with Geri Ann about what was going on?
18 A In the restroom.
19 Q Same day?
20 A Yes.
21 Q Immediately following the interaction with Mr. Nesby?
22 A Yes, because I asked her to wait for me.
23 Q Is that the first time you told anyone about
24    Mr. Nesby's actions?
25 A Yes, it is.

Page 45

1 Q Prior to Mr. Nesby's engaging in touching of you, did
2    he say anything to you that you would be -- that you
3    would consider inappropriate or unprofessional?
4 A No.
5 Q So is it fair to say that when the first inappropriate
6    encounter with Mr. Nesby occurred, that it came as a
7    surprise to you?
8 A Yes.
9 Q Mr. Nesby didn't say anything to you prior to the
10    first encounter that would lead you to believe that he
11    was sexually attracted to you; is that right?
12 A That is correct.
13 Q You didn't say anything to him prior to the first
14    encounter to make him believe that you were sexually
15    attracted to him, correct?
16 A No.
17 Q Okay. In terms of the fourth physical encounter with
18    Mr. Nesby, can you tell me what happened?
19 A We were standing outside the van at a gas station.
20    All the inmates were -- no, I'm sorry. There was one
21    inmate in the van. The rest of them were sitting on
22    the curb outside, either smoking or just talking to
23    each other.
24 Q Do you smoke?
25 A No.

Page 46

```
1   Q   Did you at the time of this transport?
2   A   No.
3   Q   I'm sorry.  I interrupted you.
4           MR. LEVINE:  Yes, you did.
5           Go ahead.
6           THE WITNESS:  And he was standing at the
7   passenger's side door.  The doors were open on the
8   van.  So the way that the door was, as you were
9   standing there, you couldn't see him directly because
10  the other door was blocking him.
11  BY MR. McGAVER:
12  Q   Which door are we talking about?
13  A   The passenger back side door.
14  Q   Thank you.
15  A   And then he called me over.  I was sitting on the curb
16  next to Geri Ann, and he had called me over and had my
17  property.
18  Q   What did he say -- specifically say to you to call you
19  over?
20  A   He said, "Sheenah, can you come here?"
21  Q   And you came over to him?
22  A   Yes.
23  Q   What happened next?
24  A   He had my property, and I asked him what he was doing.
25  He pulled my phone out and turned my phone on and
```

Page 47

```
1   said, "I want to send you my phone number because I
2   really would like to connect with you when you get to
3   Wisconsin."
4   Q   What did you say in response to this?
5   A   I was scared, so I said, "Okay."
6   Q   And tell me how he sent you his phone number.
7   A   He had my phone number from my property, so he already
8   had my phone number in his phone.  He sent it.  He
9   said he wanted to make sure the text went through, and
10  then he powered my phone off.
11  Q   Did you say anything to him while he was doing this?
12  A   No.  After he put my phone away, he -- I was standing
13  to his left side, and then he put his arm around my
14  waist and started rubbing my left butt, and then, kind
15  of, took his hand and rubbed it down underneath my
16  butt to my inner thigh on my left side.  And then he
17  kept saying, "I'm serious.  I'm really interested in
18  you."
19  Q   This is over the clothes?
20  A   Yes.
21  Q   Can you describe what you were wearing?
22  A   I do not recall what I had on.
23  Q   Do you know what kind of -- would it have been pants?
24  A   It was leggings.
25  Q   Did you say anything to Mr. Nesby when he was -- when
```

Page 48

```
1   he was touching you?
2   A   I told him, "I feel uncomfortable."
3   Q   What did he say in response?
4   A   He just smiled at me.
5   Q   Did he stop?
6   A   I walked away.  I went and sat down by Geri Ann.
7   Q   Okay.
8   A   And then, at that point is when I told Chicago what
9   was happening, and he started watching from there on
10  out.  I believe Geri Ann had said she had seen it
11  happen.
12  Q   Were you handcuffed during this encounter?
13  A   Yes.
14  Q   You wouldn't consider the encounter, or any of the
15  encounters we talked about so far, consensual; would
16  you?
17  A   No.
18  Q   I forget the total number of encounters that you said
19  there were with Mr. Nesby.  How many were there total?
20          MR. LEVINE:  Are you including the ones
21  she's already told you about?
22          MR. McGAVER:  I am.
23          MR. LEVINE:  Total.  Okay.
24          THE WITNESS:  I believe there was -- there
25  was one more after that.
```

Page 49

```
1   BY MR. McGAVER:
2   Q   Sticking with the fourth encounter, we'll call it.  Do
3   you remember how many days into the trip this
4   encounter occurred?
5   A   I don't recall.
6   Q   Okay.  You said there was one more encounter.  What
7   happened?
8   A   That was the last day that we were with him, and that
9   had happened at the office.
10  Q   At the Inmate Services office?
11  A   Yes.
12  Q   In Arkansas?
13  A   Yes.
14  Q   Tell me what happened.
15  A   It was only me and, I believe, another guy during that
16  trip there, and we had to get into another vehicle
17  with different drivers, which was a husband and wife.
18  And so they took out Chicago and put him in the other
19  van, and then they took my cuffs off me.
20  Q   Who -- you're saying "they."  Who is "they"?
21  A   It was Marius, and then the other transport guy was
22  there next to him.
23  Q   Do you remember that individual's name?
24  A   I do not off the top of my head.
25  Q   Okay.
```

**Page 50**

1   A   And Marius told the other guy that he was going to
2      take me into the office for a minute and he'd be right
3      back out. So the other guy said, "Okay." And he
4      stayed in the van, and Marius took me in the office.
5   Q   Did Marius explain to the other individuals, or to
6      you, why he was taking you into the office?
7   A   No.
8   Q   So he takes you into the office, and what happens
9      next?
10   A   He starts fon -- like playing around with a set of --
11      like, a basket of handcuffs because he had to switch
12      the cuffs out from his transport to the new transport.
13      They had to get a new set he said.
14   Q   Do you know why?
15   A   No. That's just what he had said.
16      And then he said, "If you need to use the
17      restroom, it's right there."
18      I said, "Okay, I'm going to go to the bathroom
19      really quick."
20      So then I went to go to the bathroom, but before
21      I was able to get in the bathroom, he was behind me.
22      And there was a walker on the counter -- or, like, the
23      wall. There was a counter and then a bubbler and then
24      the restroom. And he pinned me up against the back of
25      the counter and said, "I was serious about liking you,

**Page 51**

1      and I want this to be more on the outside."
2      And then he starts kissing on my neck. And he
3      had his weight against me, so I couldn't move, at that
4      point. And then, he takes his hand and starts going
5      under my shirt and touching my breasts, and then
6      slides down to my butt, and then he kisses me on the
7      mouth, and then he said that the timing for this was
8      bad because he really wanted me to go to his house.
9      And I had --
10      I said, "I need to go to the bathroom."
11      So then, I pushed him back off me, and I went
12      into the bathroom, and I sat in there for about five
13      minutes. Then I heard the door open. Like, there was
14      a bell on the office door, and somebody came in, so
15      then I quickly went out. And it was the other guy.
16      And he said to me -- Marius had told him what he had
17      done and that he had kissed me, and he said, "You
18      better never tell a soul about this."
19   Q   When you went into the office with Mr. Nesby, how long
20      was it you were in the office until he pinned you
21      against the counter?
22   A   Maybe 10 minutes.
23   Q   What were you doing during that 10-minute time?
24   A   Sitting on the couch.
25   Q   Was there a television on or something like that?

**Page 52**

1   A   No.
2   Q   You said he pinned you against the counter with the
3      front of his body pressed against the back of your
4      body?
5   A   The front of his body pressed against the front of
6      mine.
7   Q   What part of his body was physically making contact
8      with your body such that you were pinned on the
9      counter, at that time?
10   A   His stomach.
11   Q   How long were you pinned against the counter before he
12      started kissing your neck?
13   A   A couple of seconds.
14   Q   And he took his hand and he placed it under your
15      shirt?
16   A   Yes.
17   Q   And grabbed your breast?
18   A   Yes.
19   Q   Over or under your bra?
20   A   Under.
21   Q   And then he grabbed your butt?
22   A   Yes.
23   Q   Over or under your pants?
24   A   Under.
25   Q   Or under your leggings, I'm sorry. You were wearing

**Page 53**

1      leggings?
2   A   Yeah.
3   Q   And then he kissed you on your mouth?
4   A   Yes.
5   Q   And you testified you pushed away?
6   A   Yes.
7   Q   Okay. And went to use the restroom?
8   A   Yes.
9   Q   Okay. Did you believe that Mr. Nesby told this other
10      Inmate Services employee what happened while you were
11      in the restroom?
12   A   Yes. And he sent it via text. Because Chicago told
13      me, when I got out to the van, that he saw the text
14      message stating what he did.
15   Q   What did Chicago tell you about the text message?
16   A   Chicago told me that he said, "You need to come in and
17      let," -- Chicago's words were, "You need to let this
18      bitch know that she will die if she tells anyone what
19      happened in here."
20   Q   And he's relating the content of the text messages; is
21      that right?
22   A   Yes.
23   Q   Do you know who the text message was from and who it
24      was directed to?
25   A   According to Chicago, because I didn't see the

Page 54

```
 1        message --
 2   Q    Okay.
 3   A    According to Chicago, it was from Marius -- it was
 4        communication between Marius and the second male
 5        driver.
 6   Q    How far into the trip did the female driver -- was she
 7        released from your transport?
 8   A    It was the both of them until we got to the office,
 9        and then we switched over to the other two new
10        drivers.
11   Q    So the second male driver we're talking about is the
12        male in the husband and wife team; is that right?
13   A    Yes.
14   Q    And you don't know his name?
15   A    I have it wrote [sic] down at home, but off the top of
16        my head, no.
17   Q    What race is he?
18   A    African American.
19   Q    Here, I'm going to go through some exhibits, and I'll
20        have the court reporter mark them.
21             (Exhibit Number 1 was marked for
22        identification.)
23   BY MR. McGAVER:
24   Q    I'm handing you what's marked as Exhibit 1, and that's
25        an amended summons, and on Page 3 is an amended
```

Page 55

```
 1        complaint.  I'll represent that it was filed by your
 2        lawyer in Milwaukee County Circuit Court.  I'm going
 3        to have you turn to where it says Page 3 on the
 4        bottom.  You're at the right page.  Actually, you were
 5        at the right page.  Now you are.
 6             Do you see where it says, "FIRST CLAIM - ASSAULT
 7        AND BATTERY"?
 8   A    Yes.
 9   Q    If you go to Paragraph 10, it says that -- and
10        paraphrasing a little -- well, I won't paraphrase;
11        I'll read it.  "Upon information and belief, the
12        defendant Nesby, individually and as an agent, servant
13        and/or employee of the defendant Company told the
14        plaintiff Arenz that he had 188 days to return her to
15        the State of Wisconsin and that she was not even on
16        his schedule."  (As read).
17             Do you remember Mr. Nesby making that comment to
18        you?
19   A    Yes, I do.
20             MR. LEVINE:  Let me just clarify.  I thought
21        you said 188.  It's 180 days.  Go ahead.
22   BY MR. McGAVER:
23   Q    The answer was yes?
24   A    Yes.
25   Q    Do you remember how long into the trip Mr. Nesby made
```

Page 56

```
 1        that representation to you?
 2   A    Shortly after I had gotten in the vehicle.
 3   Q    The first day?
 4   A    Yes.
 5   Q    Paragraph 11, "Upon information and belief, the
 6        defendant Nesby, individually and as the agent,
 7        servant and/or employee of the defendant Company
 8        advised the plaintiff Arenz that he was going to," --
 9        next page, "-- take her to his home in Memphis,
10        Tennessee, take a shower with her, sleep with her, and
11        take intimate acts."  (As read.)
12             That representation of what Mr. Nesby said he
13        was going to do with you, we haven't talked about yet.
14   A    Correct.
15   Q    When did that -- when did Mr. Nesby make these
16        comments?
17   A    He told me that he would do this a couple times
18        throughout the trip.  Like, if we were just getting
19        out to go to the bathroom, out of the -- if I was
20        getting out of the van to go into the rest area, once
21        everybody had gone in -- like I said, I was always the
22        last to get off -- is when he said -- we -- the day
23        that I got trans -- like, that we switched transport,
24        we were supposed to go sit at a different jail
25        overnight, but he said that he would drop off Chicago
```

Page 57

```
 1        at the men's jail.  He would tell, whoever it was,
 2        that I was going to be going to the women's jail, but
 3        he wouldn't take me there.  He would instead just take
 4        me to his house.
 5   Q    And he told you that he was going to do this on more
 6        than one occasion?
 7   A    Yes, he did.
 8   Q    So other than the five instances of physical touching
 9        that we've talked about, there were more than one
10        instance of Mr. Nesby making comments similar to the
11        allegation compared to -- contained in Paragraph 11;
12        is that right?
13   A    Yes.
14   Q    More than five times?
15   A    No.  Probably about four -- three or four times he
16        told me this.
17   Q    Paragraph 12 on Page -- it's listed as Page 4 on
18        Exhibit 1.  I'm not going to read it because it's a
19        little bit on the lengthy side.  But Paragraph 12,
20        does that describe what we've talked about here today
21        as incident No. 5, in my words?
22   A    Yes, it does.
23   Q    Paragraph 13, "Subsequent to leaving the office, the
24        defendant Nesby, upon information and belief, again
25        sexually assaulted the plaintiff Arenz and pulled her
```

**Page 58**

```
 1   ponytail and reminded her that he was in control."
 2        (As read.)
 3            Did that occur immediately after -- well, let me
 4   ask it a different way.
 5            When did that occur?
 6   A   Right when I was getting into the van -- the second
 7       van.
 8   Q   The second van.  So we're talking about incident
 9       No. 5?
10   A   The last -- yes.  It was after all that had happened.
11   Q   Did anyone see Mr. Nesby pull your ponytail?
12   A   Chicago did.
13   Q   How do you know that Chicago saw Mr. Nesby pull your
14       ponytail?
15   A   Because I made eye contact with him when he did it.
16       He was already in the van waiting.
17   Q   The allegation is that he reminded her -- you -- that
18       he was in control.  What did he specifically say to
19       you?
20   A   It was that I was not to tell anybody.
21   Q   Did he say anything else?
22   A   No.  He was there and then the second driver was
23       there.
24   Q   Did the second driver hear Mr. Nesby make these
25       comments to you?
```

**Page 59**

```
 1   A   Yes, because they both looked at me when it was said.
 2   Q   On Page -- it's marked as Page 5 -- let me know if
 3       you're there -- Paragraph 17.  Do you see what I'm
 4       looking at?
 5   A   Yes.
 6   Q   It says, "Upon information and belief, the defendant
 7       Nesby individually and as an agent, servant and/or
 8       employee of the defendant Company threatened to
 9       falsely imprison the plaintiff Arenz in her residence
10       and also threatened to kill her in the event that she
11       told anyone."
12            Did Mr. Nesby threaten to kill you?
13   A   Yes, and the second driver did too.
14   Q   Was this threat made after incident No. 5?
15   A   Yes.
16   Q   Same date?
17   A   Yes.
18   Q   Did the threats occur when Mr. -- did this threat
19       occur when Mr. Nesby pulled on your ponytail?
20   A   Yes.
21   Q   And he told you that he was going to kill you if you
22       told anyone?
23   A   He said he was going to harm me.
24   Q   Could you tell me the exact words that he used?
25   A   He said if I tell anybody what happened today, I would
```

**Page 60**

```
 1       be in great harm.
 2   Q   Great harm is what he said?
 3   A   Yes.
 4   Q   Other than the five instances that we discussed of
 5       Mr. Nesby having physical contact with you on this
 6       trip, were there any other occasions where Mr. Nesby
 7       touched you?
 8   A   It was just, like, a couple of times it was really
 9       brief.  He would try to reach behind when he was
10       driving to touch my left leg.  As I said, he would
11       attempt because as soon as I saw his hand come, I
12       would move.
13   Q   With his left hand, I presume?
14   A   Yes, because he was driving at that time.
15   Q   And it happened, you said, a couple, meaning two
16       times?
17   A   Yes.
18   Q   Do you know whether Mr. Nesby assaulted or
19       inappropriately touched others he had in custody on
20       this trip?
21   A   No, he did not.
22   Q   Do you know whether Mr. Nesby ever assaulted or
23       inappropriately touched anyone else?
24            MR. LEVINE:  At any time?
25   BY MR. McGAVER:
```

**Page 61**

```
 1   Q   At any time.  Do you know?
 2   A   Yes.
 3   Q   What do you know?
 4   A   I know of the case that he just lost in Illinois for
 5       sexual misconduct of an inmate, as well.
 6   Q   That's out of Henry County, Illinois?
 7   A   Yes, it is.
 8   Q   Do you know about any other circumstances?
 9   A   He had told me briefly about a girl in Texas, when he
10       was transporting her to prison, that there were
11       allegations against him at one point, of sexually
12       assaulting her.  But he said that she lied because she
13       just needed help with a cell phone and he was helping
14       her with her cell phone because hers was broke.
15       That's all I know about that.
16   Q   Mr. Nesby didn't give you any additional details?
17   A   Just that.
18   Q   When did Mr. Nesby explain his relationship with this
19       girl in Texas to you?  How far into the trip?
20   A   It was towards the end of the trip.
21   Q   We've been going about an hour.  Are you ready for a
22       little break, or do you want to keep going?
23   A   I can keep going.
24   Q   Okay.  I'm going to hand you what will be marked as
25       Exhibit 2.
```

1　　　　　(Exhibit Number 2 was marked for
2　　　　identification.)
3　　BY MR. McGAVER:
4　　Q　Before we get to Exhibit 2 -- eventually you made your
5　　　　way to Wisconsin, and you testified previously that
6　　　　trip took about two weeks.  Is that still right?
7　　A　Yes, roughly.
8　　Q　You were brought to the Winnebago County Jail; is that
9　　　　right?
10　A　Yes.
11　Q　Who took custody of you when you were brought to the
12　　　Winnebago County Jail?
13　A　They walked me right into the jail.
14　Q　"They" meaning?
15　A　I'm sorry.  The male transport driver, after we had
16　　　switched.  Because Nesby was not on this one.  So the
17　　　new driver walked me into the jail.
18　Q　How long were you in the custody of the husband and
19　　　wife driver, during the trip?
20　A　Two, maybe three days.
21　Q　And the husband and wife were the ones that physically
22　　　brought you to the Winnebago County Jail?
23　A　Yes.
24　Q　Did they bring any other prisoners to the Winnebago
25　　　County Jail?

1　　A　Chicago was with me, but he was in the van with the
2　　　　wife.
3　　Q　So the husband and wife physically brought you inside
4　　　　the Winnebago County Jail.  And what happened next?
5　　A　They signed the paperwork and released me into the
6　　　　jail, and they left.
7　　Q　Okay.  And you were booked into the Winnebago County
8　　　　Jail?
9　　A　Yes.
10　Q　Fingerprinted and photographed?
11　A　Yes.
12　Q　Issued jail clothing?
13　A　Yes.  Yes, I was.
14　Q　How long were you in the jail before you saw a court
15　　　commissioner?
16　A　An hour.
17　Q　And then bail -- or bond was set at that hearing; is
18　　　that right?
19　A　Yes.
20　Q　$1,000 cash?
21　A　Yes.
22　Q　How long before you were bailed out?
23　A　I believe it took my husband two -- an hour and a half
24　　　to come down there.
25　Q　You're predicting my questions.  I was going to ask

1　　　　you who bailed you out.
2　　A　My husband did, yes.
3　　Q　Court records say that the initial appearance in the
4　　　　case was on May 18th, 2018.  Does that sound right?
5　　A　Yes.
6　　Q　You were bailed out the same day?
7　　A　Yes.
8　　Q　I'm going to direct your attention to the text
9　　　　messages, Exhibit 2.  These were materials provided by
10　　　your attorney in initial disclosures.  Can you tell me
11　　　what I'm looking at?
12　A　Communications via text messages off of my phone, with
13　　　Marius.
14　Q　Correct me if I'm wrong, but the white bubbles or
15　　　boxes with M next to them, those are from Marius?
16　A　Yes.
17　Q　And the dark bubbles or boxes with a picture of -- it
18　　　looks to be you.  Those are from you; is that right?
19　A　Yes.
20　Q　It's Bates stamped Arenz 61.  It starts off Wednesday,
21　　　May 23rd.  There's a text message above that -- the
22　　　first page.  The text message -- the first text
23　　　message on the page, 10:28 p.m.  It says, "Wanted to
24　　　say it was good talking to you today & I'm looking
25　　　forward to getting to know you better."

1　　　　　Do you know what date that text message would
2　　　　have been sent?
3　　A　That would have been Tuesday, May 22nd.
4　　Q　So the day prior to the text messages on the rest of
5　　　　this page, correct?
6　　A　Yes.
7　　Q　Who initiated the text message conversation, you or
8　　　　Mr. Nesby?
9　　A　Mr. Nesby.
10　Q　Okay.  When is the first time that you responded to
11　　　one of Mr. Nesby's text messages?
12　A　It would have been the message shown for Wednesday,
13　　　May 23rd at 11:55 a.m.
14　Q　So the message that says, "I'm out with my family for
15　　　the day today so I don't have much service.  It cuts
16　　　in and out.  Can I give you a call tomorrow afternoon
17　　　at all?"  (As read.)  That's the first time that you
18　　　had text message communication with Mr. Nesby, right?
19　A　Yes.
20　Q　Did you have any other -- strike that.
21　　　　　From the point in time where Mr. Nesby was no
22　　　longer participating in your transportation to the
23　　　Winnebago County Jail until this text message, did you
24　　　have any other communication with him whatsoever?
25　A　No.

Page 66

| | |
|---|---|
| 1 | Q  Not telephone calls? |
| 2 | A  Yes.  There was one -- so it was -- if I recall |
| 3 | correctly, on Tuesday, the FBI came over, and we had |
| 4 | placed our first call to Marius, which is what my |
| 5 | assumption would be to the text message he wrote at |
| 6 | 10:28 p.m. that said it was good talking to me today. |
| 7 | Any communication via telephone, that I had, was |
| 8 | recorded by the FBI. |
| 9 | Q  So you reported Mr. Nesby's actions to law enforcement |
| 10 | prior to this text message chain which you said |
| 11 | started on Tuesday May 22nd, 2018; is that right? |
| 12 | A  May 18th, as soon as I got booked into the jail, my |
| 13 | fingerprint and picture done, I reported it. |
| 14 | Winnebago Detective Craig came to speak with me. |
| 15 | Q  Is it Craig Bohn, B-o-h-n? |
| 16 | A  I believe so.  He came to speak to me.  And then, I |
| 17 | believe it was the following week, him, |
| 18 | Detective Craig, and another Winnebago County |
| 19 | detective and two agents from the FBI came to my house |
| 20 | and spoke to me about this, and that's when it was |
| 21 | turned over, at that point, basically, to the FBI. |
| 22 | Q  Okay.  And I'll have some more questions about that in |
| 23 | just a second, but back to the text message |
| 24 | communications. |
| 25 |     Is all of the -- take a minute to look through |

Page 67

| | |
|---|---|
| 1 | Exhibit 2, if you would.  I'm going to ask you whether |
| 2 | all of the text message communications that you had, |
| 3 | either to or received -- that you drafted to or |
| 4 | received from Mr. Nesby, occurred after you reported |
| 5 | Mr. Nesby's actions to law enforcement.  Is that true? |
| 6 | A  Yes, it is. |
| 7 | Q  Okay.  You never texted Mr. Nesby before reporting |
| 8 | what he did to the police, right? |
| 9 | A  That is correct. |
| 10 | Q  Did the police direct you to engage in text message |
| 11 | conversation with Mr. Nesby? |
| 12 | A  Yes.  Every response that I had made was -- I was told |
| 13 | what to say from Mike from the FBI.  So when Marius |
| 14 | would send me a text message, I would screenshot that |
| 15 | message.  I would send it via text to Mike. |
| 16 | Q  Is that Agent Michael Meyer? |
| 17 | A  Yes.  And then, he would send me a response on what to |
| 18 | say. |
| 19 | Q  And you followed Agent Meyer's directions? |
| 20 | A  Yes, I did. |
| 21 | Q  Okay.  So in realty, any communications directed to |
| 22 | Mr. Nesby that are contained in Exhibit 2 were drafted |
| 23 | by FBI Agent Michael Meyer; is that right? |
| 24 | A  Yes, it is. |
| 25 | Q  Okay.  You didn't come up with the content of any of |

Page 68

| | |
|---|---|
| 1 | these messages yourself; is that true? |
| 2 | A  That is correct. |
| 3 | Q  Okay. did you ever participate in any other forms of |
| 4 | communication with Mr. Nesby? |
| 5 | A  Telephone. |
| 6 | Q  Okay.  Other than telephone or text, anything else? |
| 7 | A  No. |
| 8 | Q  No Snapchat?  Facebook Messenger?  Instagram?  Other |
| 9 | electronic communications? |
| 10 | A  He tried to add me on Facebook, but I never accepted. |
| 11 | Q  Is that friend request still hanging out there |
| 12 | somewhere? |
| 13 | A  No.  The FBI had me block it. |
| 14 | Q  After Mr. Nesby was released from participating in |
| 15 | your transport, did you ever see him again? |
| 16 | A  No. |
| 17 | Q  When you were released from the Winnebago County Jail, |
| 18 | after having spent -- I think you said about an hour |
| 19 | in there; is that right? |
| 20 | A  I spent about a total of five hours it took for them |
| 21 | to post the bail and release me. |
| 22 | Q  Okay.  But when you were released, where did you go? |
| 23 | A  Home. |
| 24 | Q  Your home?  Your husband's house -- home? |
| 25 | A  My home in Kaukauna. |

Page 69

| | |
|---|---|
| 1 | Q  Okay.  Your parents' -- |
| 2 | A  Well, our home.  No.  I had an apartment in Kaukauna. |
| 3 | Q  Inmate Transport Services picked up in Arizona.  What |
| 4 | were you doing in Arizona? |
| 5 | A  My husband and my son had a house out there.  He was |
| 6 | going to school full time.  My son was going to school |
| 7 | out there, as well.  I moved out there full time in |
| 8 | December after I was terminated my from employment. |
| 9 | We had that house since July of the previous year. |
| 10 | Q  And you still retained the residence in Kaukauna? |
| 11 | A  Yes, I did. |
| 12 | Q  Okay.  In the criminal case we talked about, |
| 13 | 18-CF-179, the Winnebago County case, you were |
| 14 | ultimately convicted in that case, right? |
| 15 | A  Yes, I was. |
| 16 | Q  Because of a no contest plea? |
| 17 | A  Yes. |
| 18 | Q  Okay.  And you were sentenced on October 11th, 2019? |
| 19 | A  Yes. |
| 20 | Q  Three years probation? |
| 21 | A  Yes. |
| 22 | Q  A year of jail?  Is that right? |
| 23 | A  Yes. |
| 24 |     MR. LEVINE:  I'm going object.  These |
| 25 | questions are highly irrelevant.  Go ahead.  You can |

Page 70

1     ask, but I don't know where you're going on this.
2  BY MR. McGAVER:
3   Q   Are you currently residing in the Jefferson County
4       Jail?
5   A   Yes, but I have Huber.  So I'm out for 12 hours a day
6       for child care.
7   Q   Back to the reporting of the assault.  You said on --
8       or the assaults I should say.  On the trip itself, you
9       said you told Geri Ann and then Chicago; is that
10      right?
11  A   Yes.
12  Q   Did you tell anyone else about Nesby's assault, while
13      you were being transported?
14  A   Just those two.
15  Q   And when you arrived at the Winnebago County Jail, did
16      you tell any staff member, or anyone you encountered
17      at the Winnebago County Jail, about the assault?
18  A   Yes, the deputy at the booking station.
19  Q   You did?
20  A   Yes.
21  Q   Do you remember that deputy's name?
22  A   No, I do not.
23  Q   Did you tell anyone else at the Winnebago County Jail?
24  A   They brought in Detective Craig immediately after I
25      reported what had happened at transport.

Page 71

1   Q   So you were still in custody at the Winnebago County
2       Jail when you started having conversations with
3       Detective Craig Bohn about Mr. Nesby's actions; is
4       that right?
5   A   Yes.
6   Q   Okay.  Detective Bohn met with you at the Winnebago
7       County Jail?
8   A   Yes.
9   Q   How much time did he spend with you?
10  A   About a half hour, I would say.
11  Q   He took a formal statement from you?
12  A   Yes, he did.
13  Q   Did he have you write anything down?
14  A   Yes, I believe so.  He, kind of, formed it out himself
15      and then had me sign it.
16  Q   Did Detective Bohn tell you anything about the next
17      steps in the investigation into Mr. Nesby?
18  A   Yes.  He said because it was multi-state, he was going
19      to be contacting the FBI.
20  Q   When is the next time you heard anything about law
21      enforcement's investigation into Mr. Nesby's actions?
22  A   We're at May 23rd, I believe.
23  A   Michael Meyer contacted me the next day, and then they
24      came to my house -- I believe it was Tuesday the 22nd,
25      May 22nd.

Page 72

1   Q   We were on the 18th, I'm sorry.  That's the date that
2       you were brought to the Winnebago County Jail,
3       May 18th, 2018, right?
4   A   Yes.
5   Q   And did the FBI come to your house on -- I believe you
6       said May 23rd.  Is that right?
7   A   I believe it was the 22nd.
8   Q   The 22nd.  I misheard you.  I'm sorry.
9   A   Yes.
10  Q   That's FBI Agent Michael Meyer?
11  A   Yes.  It was FBI Agent Michael Meyer and another FBI
12      agent and Winnebago Detective Chris, and then, another
13      Winnebago detective.  So there was four of them.
14  Q   How long did that meeting last?
15  A   A few hours.
16  Q   And did you tell these detectives everything that
17      you've told me here today?
18  A   Yes.
19  Q   Did you tell them anything in addition to what you've
20      told me today, in terms of the five sexual assaults
21      that you allege Mr. Nesby perpetrated?
22  A   No.
23  Q   Is there anything different from what you told law
24      enforcement than what you told me here today?
25  A   I do not believe so.

Page 73

1   Q   Did you ever have any conversations with Fara,
2       F-a-r-a, G-o-l-d, Gold?
3   A   No, I have not.
4   Q   What about Emily Stephani, S-t-e-p-h-a-n-i?
5   A   Yes.
6   Q   Who is Ms. Stephani?
7   A   She's a special victims coordinator for the FBI.
8   Q   When did you speak with Ms. Stephani?
9   A   It was -- I do not recall the exact date, but it was
10      the week of the 23rd, somewhere in there.
11  Q   What did you talk to Ms. Stephani about?
12  A   She was -- it was explained to me that she is the
13      special victims coordinator.  So if I was having
14      problems or issues processing what had happened, or
15      just needed somebody to talk to, I could contact her
16      for, just assistance, or if I wanted to do counseling,
17      contact her, and she could give me information on
18      that.
19  Q   And you did contact her, obviously?
20  A   Yes.
21  Q   Did you request counseling from her?
22  A   No, I did not request any counseling from her.  I saw
23      my own counselor.
24  Q   What did you ask Ms. Stephani to do for you?
25  A   I do not recall, at that time, what I had asked her

Page 74

```
1    for.
2  Q Did you have just that one conversation with
3    Ms. Stephani or did you have multiple conversations
4    with her?
5  A Multiple. I'm still in contact with her.
6  Q When's the last time you talked with her?
7  A On Saturday.
8  Q What did you guys talk about?
9  A I had updated my phone number with her.
10 Q Anything else?
11 A She had sent me a message back saying thank you and
12   that she would have an update -- she was going to get
13   an update from me -- from the FBI on where my case is
14   with him, federally.
15 Q Did you tell her that you were being deposed today?
16 A Yes, in a conversation prior to Saturday.
17 Q Michael Meyer we've already talked about. Brian
18   D'Arcy, D apostrophe -a-r-c-y. Does that name ring a
19   bell?
20 A Yes, he's an FBI agent.
21 Q You've had some contact with Agent D'Arcy?
22 A Yes.
23 Q Did Agent D'Arcy come to your house?
24 A Yes.
25 Q With Agent Meyer?
```

Page 75

```
1  A Yes.
2  Q Just those two agents, or were there others at your
3    house?
4  A The first few times that they came it was the four of
5    them; two FBI, two Winnebago detectives.
6  Q You said the first few times that they came.
7  A It was about three or four times, yes, that they came.
8    And then it would drop down to -- Winnebago had
9    completely stepped out of it and had just left it up
10   to -- Brian and Michael from the FBI would come.
11 Q How many times did law enforcement members visit your
12   house as a result of their investigation of this
13   matter?
14 A They would come every Tuesday.
15 Q Why every Tuesday?
16 A Because that's when we would call Marius.
17 Q So you had weekly phone conversations with Mr. Nesby?
18 A Yes.
19 Q What kind of things did the FBI agents ask you to talk
20   to Mr. Nesby about?
21 A Reliving from when I got picked up.
22 Q What do you mean by that?
23 A Having him talk about the sexual assaults that he did
24   to me, and getting him to admit that. Getting him to
25   admit that he kissed me. Having him explain what he
```

Page 76

```
1    wanted to do to me, if I would have gone to his house.
2    And then, the last thing was they wanted me to say
3    that I was going to tell law enforcement what he had
4    done to me, and he begged me not to. And they had
5    said -- I believe our last text message - our last
6    phone call was, "Please do not contact me again."
7  Q Marius told you that?
8  A No. They had me tell Marius that.
9  Q You said every Tuesday you would make a coordinated
10   call, I'll call it, to Marius. Is that a fair
11   characterization?
12 A Yes.
13 Q How many total calls do you believe you made, with the
14   assistance of law enforcement, to Mr. Nesby?
15 A I don't recall how many times they came. I would
16   assume -- I would say, probably, two months.
17 Q When is the last time you made such a phone call?
18 A 2018.
19 Q Okay. So roughly eight times -- eight phone calls
20   with Mr. Nesby, if my math is right. Does that sound
21   fair?
22 A No. Because there was other times where he would send
23   me a text message and he would ask to talk to me, and
24   they would show up the next day. So kind of, like,
25   here. This was on Wednesday. They asked me to have
```

Page 77

```
1    him call tomorrow. So they came over on that Thursday
2    to talk. So there was a couple of times where it was
3    out of the normal schedule.
4  Q More than 20 phone calls with Mr. Nesby, with the
5    assistance of law enforcement?
6  A No. It was less than 20.
7  Q But more than 10?
8  A I would say so.
9            MR. LEVINE: You can keep going. (Leaving
10   room.)
11           THE WITNESS: Okay.
12           MR. McGAVER: Sure.
13 Q Does the name Demar Hampton ring a bell to you?
14 A I do not recall that name.
15 Q Have you ever heard the name Randy Cagle, C-a-g-l-e?
16 A I don't recall that name.
17         (Mr. Levine re-entered the room.)
18 BY MR. McGAVER:
19 Q What about Steven Tyler? Not the guy from Aerosmith.
20 A No, I do not recall that name.
21 Q Okay. Do you recall the names of any other employees
22   from Inmate Services Corporation, other than --
23         MR. LEVINE: Let's back up for a second.
24   Tyler. You know that name, right? Steven Tyler?
25   Wasn't he the other driver or something? Or no?
```

Page 78

```
1          THE WITNESS: I have the gentleman's name
2   written down, but I do not recall at the top of my
3   head who they were.
4          MR. LEVINE: Okay.
5          THE WITNESS: It could have been, but I
6   don't recall. I think there were pictures in here of
7   the drivers. Because they had me -- they gave me a
8   lineup.
9   BY MR. McGAVER:
10  Q   And "in here", you're referring to Exhibit 2, right?
11  A   Yes. Sorry.
12          Mary Davis.
13  Q   Who's Mary Davis?
14  A   That was the wife of the second transport driver.
15  Q   And there's the third -- second -- strike that.
16          MR. LEVINE: Who was the wife -- that guy
17  with the wife?
18          THE WITNESS: I don't recall his name.
19          MR. LEVINE: Off the record for a second.
20          (A brief discussion was held off the
21  record.)
22          MR. McGAVER: Back on the record. I'll ask
23  the question again.
24  Q   After refreshment of your recollection through this --
25  through your attorney going through some of his notes,
```

Page 79

```
1   I believe, does the name Steven Tyler ring a bell?
2   A   Yes. He was the driver for the second transport.
3   Q   He was the husband in the husband/wife combo; is that
4   right?
5   A   Yes.
6   Q   Do you remember the wife's name now?
7   A   Mary Davis.
8   Q   And in Exhibit 2, it's Bates No. Arenz 72 and Arenz
9   73, that mentioned the name of Mary A. Davis; is that
10  right?
11  A   Yes.
12  Q   What am I looking at on Bates No. 72 -- Arenz 72 and
13  73, with Mary Davis' name there? Because it doesn't
14  appear to be a text message. What is it?
15  A   This was a screenshot of her Facebook page that I had
16  sent.
17  Q   Are you Facebook friends with Mary Davis?
18  A   No, I am not.
19  Q   What about Steven Tyler?
20  A   No, I am not.
21  Q   You don't know the name Randy Cagle, right?
22  A   No, I do not.
23  Q   Anyone -- do you know the identity, or the name, of
24  anyone else from Inmate Services Corporation other
25  than those two we've talked about here today?
```

Page 80

```
1   A   No, I do not.
2   Q   Prior to May of 2018, you participated in some mental
3   health treatment, right?
4   A   Yes, I have.
5   Q   Do you remember who treated you?
6   A   I've seen several providers.
7   Q   What for?
8   A   I was diagnosed with bipolar and manic depressive.
9   Q   Do you remember who made those diagnoses initially?
10  A   A psychiatrist from Dean Healthcare.
11  Q   Do you remember that provider's name?
12  A   No, I do not.
13  Q   Prior --
14  A   They had sent me for testing at one of their clinics
15  for a full evaluation.
16  Q   Prior to May of 2018, how often did you participate in
17  mental health treatment?
18  A   I would say from 2001 until 2012 I was on medication.
19  Q   What medications?
20  A   I was on -- they've tried me on several different
21  medications for my mental stability, I guess, to help
22  regulate me, and then I went to a counselor. I went
23  to a counselor a lot. And then, I was starting to do
24  really good weaning myself off the medicine and
25  learning how to control myself without it, but still
```

Page 81

```
1   seeing a counselor.
2   Q   And this is all in the period 2001 to 2012?
3   A   Yes. I was still on anxiety medication.
4   Q   Did you stop treating in 2012?
5   A   I didn't stop treatment fully. I would still see,
6   like, a counselor here and there if I had troubles
7   just regrouping myself.
8   Q   Other than medication and visits with the counselor,
9   did mental health professionals do anything else to
10  treat you prior to May of 2018?
11  A   No.
12  Q   Prior to May of 2018, other than manic depress -- I'm
13  sorry, manic depressive disorder, bipolar disorder,
14  were you diagnosed with anything else?
15  A   PTSD.
16  Q   And what was the event prior to May of 2018 that would
17  have caused the PTSD diagnosis?
18  A   I was severely abused for many years by my son's
19  father.
20  Q   Prior to the actions of Mr. Nesby, were you ever a
21  victim of sexual assault?
22  A   Yes, once.
23  Q   When did that occur?
24  A   When I was 17.
25  Q   Do you attribute the sexual assault when you were 17
```

Page 82

1  to any of the mental health issues that you were
2  treated for?
3  A  No.
4  Q  How long after you were released from custody in this
5  case, in May of 2018, did it take you to seek
6  treatment for mental health issues or a trauma caused
7  by Mr. Nesby's assault?
8     That was a poor way of asking a question.
9     May 2018 you were released from custody. When
10  is the next time that you treated as a result of what
11  you say that Mr. Nesby did?
12  A  I don't recall the date, but it did take some time
13  because I had to reestablish insurance before I could
14  go anywhere.
15  Q  Is it possible that it occurred sometime in November
16  of 2018?
17  A  Yes, that is a possibility.
18  Q  Who's April Garcia?
19  A  She was my primary care physician.
20  Q  What about Jennifer Bleak?
21  A  She's my counselor.
22  Q  Currently?
23  A  Yes.
24  Q  And you've been treating with Jennifer Bleak since
25  2018; is that right?

Page 83

1  A  I think 2019.
2  Q  Is Jennifer Bleak a physician -- a doctor?
3  A  No.  She's a counselor.
4  Q  Who's Kathleen O'Neill?
5  A  She was a counselor that I had before Jennifer.
6  Q  And she was at Watertown Regional Medical Center; is
7  that right?
8  A  Yes, that is correct.
9  Q  You saw Ms. O'Neill for overwhelming anxiety,
10  depression and PTSD symptoms; is that right?
11  A  Yes.
12  Q  How long did you treat with Ms. O'Neill?
13  A  I only saw her a couple of times before switching over
14  to Jennifer.
15  Q  Is there any reason that you switched over from
16  Ms. O'Neill to Jennifer Bleak?
17  A  Yes.  I was having a really bad day trying to control
18  my anxiety on a day that I had an appointment, so I
19  called her the morning of my appointment to cancel,
20  and their policy doesn't allow it.  So she ended up
21  dropping me.
22  Q  If that policy did not require that she drop you as a
23  patient, would you have continued to see Ms. O'Neill?
24  A  Yes.  I have seen Kathleen since 2009 or 2010.
25  Q  Same counselor?

Page 84

1  A  Yes.
2  Q  Kathleen O'Neill?
3  A  Yes.
4  Q  Does the name Stanley Fudala, F-u-d-l -- F-u-d-a-l-a,
5  ring a bell?
6  A  Yes.
7  Q  Who's Stanley Fudala?
8  A  He is a -- he prescribes medications for me for mental
9  health.
10  Q  Is he a psychiatrist?
11  A  Yes.
12  Q  What medications does Dr. Fudala prescribe for you?
13  A  Currently, he has me on hydroxyzine.
14     MR. LEVINE:  Do you know how to spell that?
15     MR. McGAVER:  She might ask you afterwards,
16  that's why.
17     THE WITNESS:  I honestly do not know.
18     MR. McGAVER:  We'll track it down.  You'll
19  leave it to me, right?
20     COURT REPORTER:  It's okay.
21     THE WITNESS:  I have my bottle in my purse.
22  BY MR. McGAVER:
23  Q  What does hydroxyzine do for you?
24  A  It helps calm me.
25  Q  Is it effective, do you think?

Page 85

1  A  Is it effective?
2  Q  Yeah.
3  A  Yes, it is.
4  Q  Any other medications that Dr. Fudala prescribes for
5  you?
6  A  None that I am currently taking.
7  Q  Are you currently treating with Dr. Fudala?
8  A  Yes.
9  Q  You stopped treating with Kathleen O'Neill in January
10  -- January 15th of 2019, or thereabouts; is that fair?
11  A  Yes.
12  Q  And just because of their cancellation policy, right?
13  A  Yes.
14  Q  Okay.  And about that time, it appears, you started
15  treating with Dr. Fudala.  Is that about right?
16  A  Yes.
17  Q  Are you seeing any other mental health providers
18  currently, besides Dr. Fudala and Jennifer -- I can't
19  think of her last name.
20  A  I think you had said it was Bleak.  I honestly don't
21  know her last name, but her first name is Jennifer.
22  She's through Family Services.
23  Q  But she's a counselor?
24  A  Yes.
25  Q  And Jennifer Bleak could be somebody else?

Page 86

1   A   It's a possibility, but I don't know of any other --
2   Q   I'm not trying to trip you up.  Jennifer Bleak is a
3       physician that showed up on some of the medical
4       records.
5   A   Okay.  So...
6   Q   I'm trying to get a hold of who the cast of characters
7       are.
8   A   No, she is not a physician.  She's a counselor.
9   Q   Okay.  I'm going to give you Exhibit 3.
10          (Exhibit Number 3 was marked for
11          identification.)
12  BY MR. McGAVER:
13  Q   I'll represent to you that this is a medical record
14      provided by your attorney, detailing some treatment on
15      January 15th of 2019.  I'll have you turn to where it
16      says Bates No. Arenz 29 at the bottom.  Let me know
17      when you get there.
18  A   I am there.
19  Q   All right.  It says, "Nursing Documentation:
20      Behavioral Health Forms."  And then, down that list it
21      says, "Ever forced sexual activity:".  The answer to
22      that question is, "Yes."
23          Is there any other instance of sexual assault,
24      other than the ones we talked about here today, that
25      would have caused you to answer that question yes?

Page 87

1   A   Yes.
2   Q   What have we missed?
3   A   This -- so this isn't related to this case.
4   Q   Okay.
5   A   This was when I was 17.
6   Q   Okay.  Two lines down from there where it says,
7       "Relationship of sexual abuser BH:  Stranger," does
8       that refer to Marius Nesby?
9   A   No.
10  Q   Who's the stranger that sexually abused you?
11  A   The one that had -- the forced sexually was a guy that
12      I didn't know, like I said, when I was 17.
13  Q   Oh, this is the same incident when you were 17?
14  A   Yes.
15  Q   So other than the incident when you were 17 and the
16      incidents with Mr. Nesby, have you been a victim of
17      sexual assaults?
18  A   My son's father, but that was more of, like, sexual
19      abuse, that's what the PTSD back then was from.
20  Q   And I'm sorry to bring up these topics.  I really
21      don't take any pleasure from it.
22          We're done with Exhibit 3.
23          Do you think you've made any progress in
24      treatment since May of 2018?
25  A   It's getting there, yes.

Page 88

1   Q   What kind of progress do you think you've made?
2   A   How to -- I'm learning how to control my surroundings.
3       I'm learning how to control my anxiety a little bit
4       more without the medication.  It's kind of a difficult
5       answer -- to answer because of the trauma and
6       everything that has happened to me that I am still
7       suffering from.  But it is a work in progress, and I
8       am slowly getting back to my normal lifestyle.
9   Q   When is the last time you had an appointment with
10      Dr. Fudala or your counselor, or anybody else?
11  A   Dr. Fudala was in November of 2018, and then --
12  Q   2018 you said?
13  A   I'm sorry, 2019.  And then, my counselor was in
14      December of 2019.
15  Q   Do you have any appointments currently scheduled with
16      either Dr. Fudala or another mental health provider?
17  A   Not with Dr. Fudala at this time but with my
18      counselor.  I see her every two weeks.
19  Q   As part of the allegations made in this case, are you
20      claiming that you're unable to work because of the
21      actions of Mr. Nesby?
22  A   I tried to go to work after the things that had
23      happened to me.  I do struggle quite a bit.  So it's
24      something that I do -- I try.  It's just very
25      difficult for me.

Page 89

1   Q   When's the last time that you applied for a job?
2   A   My last job was in December, so I have not applied.
3   Q   Okay.  You're not alleging that you received any
4       sexually transmitted disease from Mr. Nesby; is that
5       right?
6   A   No, I do not.
7   Q   Okay.  And you're not alleging that he engaged in
8       unconsentual [sic] intercourse with you, right?
9   A   That is right.
10  Q   Okay.  And there was no oral sex involved with your
11      interactions with Mr. Nesby?
12  A   No, there was no.
13  Q   Okay.  Fair to say that your interactions with
14      Mr. Nesby were unconsentual [sic] sexual contact?
15  A   Correct.
16  Q   Is there anything about your interactions with
17      Mr. Nesby that prevent you from participating in any
18      of your hobbies or your -- the things that you used to
19      do that you don't get the same enjoyment out of that
20      you did before you met Mr. Nesby?
21  A   Yes.  There's a lot of stuff.
22  Q   Like what?
23  A   I do not leave my home unless I have somebody with me.
24      I now have security cameras all around my house and
25      outside of my house.

Page 90

1  Q   How many cameras do you have?
2  A   Four.  I -- even going shopping with my son or
3      something, I still have panic attacks, thinking that
4      somebody is watching me or somebody is going to get to
5      me.
6  Q   What --
7  A   So I struggle.
8  Q   I'm sorry.  I didn't mean to interrupt you.
9          What do you define as a panic attack?
10 A   My anxiety gets really, really bad at times, and it's
11     very hard to bring down at times, so then I have to
12     take my medication for it.
13 Q   Anything else that you can tell me about how
14     Mr. Nesby's actions have affected your ability to
15     carry on with your daily activities?
16 A   Working -- even as a housekeeper, my fear was that
17     him, or somebody else that he knows, was going to be
18     waiting in a room for me when I went in to clean it.
19     So I usually had one of the other girls open the door
20     for me and brace it open, basically, doing -- making
21     sure nobody was in the room before I went in.
22 Q   And you did that when you were working as a
23     housekeeper?
24 A   Yes.
25 Q   Anything else that you can tell me?

Page 91

1  A   No.  I think that's it.  I try to stay home as much as
2      I can.  I don't like to go out.
3          MR. McGAVER:  Let me just page through my
4      notes.  I promise to do it quickly.  I think I'm all
5      done.
6          (A brief discussion was held off the
7      record.)
8          MR. McGAVER:  That's all I have.  Thank you.
9
10         (Deposition concluded at 3:23 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1  STATE OF WISCONSIN )
2                      )SS
3  MILWAUKEE COUNTY    )
4          I, CHRISTINE A. KOVAC, RPR, Registered
5  Professional Reporter and Notary Public in and for the
6  State of Wisconsin, do hereby certify that the preceding
7  Deposition was recorded by me and reduced to writing under
8  my personal direction.
9          I further certify that said Deposition was
10 taken before me at LAW OFFICES OF ROBERT A. LEVINE, 630
11 North Broadway, Milwaukee, Wisconsin, on the 9th day of
12 January, 2020, commencing at 1:19 p.m. and concluding at
13 3:23 p.m.
14         I further certify that I am not a relative
15 or employee or attorney or counsel of any of the parties,
16 or a relative or employee of any such attorney or counsel,
17 or financially interested directly or indirectly in this
18 action.
19         In witness whereof, I have hereunto set my
20 hand and affixed my seal of office at Milwaukee,
21 Wisconsin, on this 17th day of January, 2020.

22         _____
23         CHRISTINE A. KOVAC - Notary Public
           In and for the State of Wisconsin.
           My commission expires:
24         October 3, 2023
25